## LORING & Another *v.* PALMER.

APPEAL FROM THE CIRCUIT COURT OF THE UNITED STATES FOR THE EASTERN DISTRICT OF MICHIGAN.

Argued March 18, 19, 1886.—Decided May 10, 1886.

A series of letters and agreements passing between the parties interested, all relating to the same property, which, when read together, show a purpose in all the parties to create a trust respecting it, and which express and define that trust and the parties and their respective interests, creates a trust fully expressed and clearly defined within the meaning of the statute of the State of Michigan which enacts that "express trusts" may "be created" "for the beneficial interest of any person or persons when such trust is fully expressed and clearly defined on the face of the instrument, creating it."

When a conveyance of land is made to two or more persons, and the deed is silent as to the interest which each is to take, the presumption will be that the interests are equal. This rule applies to two or more *cestuis que trust*, beneficiaries under a common deed of trust, and prevails in Michigan.

The statute of Michigan which enacts that "every disposition of land" "shall be directly to the person in whom the right to the possession and the profits shall be intended to be vested, and not to any other to the use of or in trust for such person ; and if made to one or more persons, in trust for or to the use of another, no estate legal or equitable shall vest in the trustee," does not apply to a trust not expressed in the deed, but created by an independent instrument or instruments, executed at a different time, or times, from the execution of the deed.

This was a suit in equity brought by Charles H. Palmer, the appellee, against Elisha T. Loring and Charles A. Welch, the

appellants, to obtain a conveyance of one undivided third part of the N. ½ of the N. W. ¼, and of the N. W. ¼ of the S. W. ¼, sec. 23, T. 56, N. R. 33 W., Houghton County, Michigan, containing in all 120 acres, on the ground that the lands were bought from Thomas F. Mason for Loring, Palmer, and William B. Frue, and the title taken by Loring in trust for himself and his associates.   The material facts were these:

From the year 1856, and perhaps before, Palmer, Loring, and Frue had been engaged in the purchase of lands in the upper peninsula of Michigan, in the formation of mining corporations, and in the purchase and sale of mining stocks.   Frue resided at the time in Houghton County, which was in the upper peninsula, Palmer at Pontiac, Michigan, and Loring at Boston, Massachusetts; but Palmer spent much of his time at the peninsula and in its vicinity.   During all the time the purchases were generally made and the titles, both of lands and stocks, taken in the name of Loring, as trustee for all the parties in interest.   Among other lands purchased in this way were some which were afterwards put into the Ossipee Mining Company, a mining corporation promoted by these parties, with a capital stock consisting of 20,000 shares, of which Loring and Frue each owned 2250, and Palmer 2220.

Under these circumstances Palmer and Frue met Thomas F. Mason, of New York, at Houghton, and negotiated with him for the purchase of the lands in question.   The price was to be $20,000, payable $5000 down, $7500 in six months, and $7500 in eight months, with interest at the rate of seven per cent. per annum on the last two sums.   No contract was executed at the time, as Mason preferred a form which he had at home, and the matter was postponed until he got there, with the understanding that Loring should execute the formal contract in New York, and pay the $5000.   A memorandum of the transaction was, however, made at the time and assented to by both parties.   This memorandum has been lost, but the testimony showed that it was substantially the same as the contract made with Loring, hereinafter referred to, except that either "Charles H. Palmer and William B. Frue" were named as vendees, or "Charles H. Palmer and his associates."

The day that this occurred Palmer wrote from Michigan to Loring, in Boston, as follows:

"KEARSARGE MINING COMPANY,
        CALUMET, MICH., *June 18th,* 1868.
"E. T. LORING, ESQ.

"Dear Sir: I have this day bought of T. F. Mason the following lands in the Hecla section 23, namely, the north half of the northwest quarter, and the northwest quarter of the southwest quarter, in all 120 acres, for $20,000, $5000 down, $7500 in six months, and $7500 in eight months, with 7 per cent. interest on the last two sums. I had the contract drawn up and was ready to pay him the $5000 down; but as he had just come from Ontonagon and the boat was to leave in two hours, he preferred to return to New York and write such a contract as he had given Hurlburt on his purchase, and have you execute the contract and pay him the $5000. He will then send you the contract, and I want you to see it carried out in all respects. Mason agrees that if you are away or do not do this, he will send it to me to do, and to carry out as I have agreed to do. Mr. Mason has given me his word, in the presence of Frue, that all this shall be done as he agreed, and that I shall have the land—making his word as good as his deed. There was not time to do this before Mason left, and I want you to treat him in this matter without doubting him at all. I will write you again this evening and send the contract I had drawn up. He has a copy of it, with the terms, as I have stated. This matter is very important. The purchase will add to the Ossipee five dollars per share at once in actual value. I do not want anything said of this at all. You will see by this that we shall get a division with the Hecla so as to get what will make a mine out of it by itself. We can make the Calumet vein by this over 3200 feet in length. The purchase is very important. I send this by the hands of Randall, and will write again to-night by mail. Do not mention this. If you can, I would go to New York and see Mason and close this at once. In no case will this be neglected. It is a fortune to us if well handled. Mason has the contract which

I drew up, and will show it to you. But this will tell you what is to be done. I give a sketch of the land. When I present the whole matter you will see how important it is to us. We can take from Hecla from 1550 to 2305 feet in length, and still give them out of this purchase double the amount of mining value that we get from them. The fact is, this ground bought is worth more to them than the ground next to Ossipee. It is for this reason that I do not want anything said till we have fully considered this matter together and see how we shall open it to Shaw. This is a rough sketch of the land bought. The vein is nearer to it than I have given the dotted lines, as if made to divide between them. Hecla would be free then to give us 100 acres, 50 of which would carry the vein, and we should give them 100, all of which would carry the vein. You will see the importance of this matter, and that we should not say anything till we consult. The Hecla is rich and we can make the Ossipee as rich.

"Truly yours,　　　CHARLES H. PALMER."

The next day he wrote again as follows:

"KEARSARGE MINING COMPANY,

CALUMET, MICH., June 19th, 1868.

"E. T. LORING, ESQ.,

"Dear Sir: I have drawn a map of the land bought of Mason. The Hecla owns all in the section, but the 40 and 80. You may say that Shaw will not do anything about it. We can wait as long as he can, as we have enough to mine till the Hecla needs some of this land. The least I would take now would be the 80 next the Ossipee, through which the lode runs, and most likely with the right of mine perpendicular to the vein in the direction of the line A B. I do not think best now to say anything to Shaw about this. I have given on the other side the land in the Calumet section 14, bought by Hurlburt. I could have bought this a year ago last winter for $40,000, including the 120 now bought. If I had done so, we could now have this land in 23 for nothing, as Shaw will have to buy Hurlburt out even at $100,000. Stanton, who now has the Huron, is intending to buy Hurlburt out in 14, and I wish you would see him when he returns, and urge him to do it. Hurl-

burt bought of Mason some 1200 acres of land in 14, 15, 11, 22, and 28. If Stanton can get the land in 14, 480 acres, and the land in 22, on the east half, I should like it, as the land in 22 is desirable for us. Hurlburt offered the land in 14 to Stanton for Huron stock. This would be a good thing for Stanton. I shall write Stanton on this subject. This matter is not to be talked about. I had a long talk with Stanton, and he is inclined to buy it. He has let Hurlburt have money.

"I send the duplicate of the contract I gave Mason. Mason is to write a contract like his contract with Hurlburt, and send to you. Mason talked this matter over with Frue and myself, and says we shall have this land as agreed, and that his word is as good as his deed. I trust nothing will be left undone to carry this out, and you had better go to New York and see it done. We shall get out of Hecla all I have indicated. The land we would exchange is more convenient on surface and underground for them than what they would give us. It will be under their machinery and improvements. This is a great thing for Ossipee. You had better telegraph me as soon as this is done, as I shall be most anxious about it. I wrote you to-day and sent by Randall, and I write this by mail. I shall put a note on this for Burr to open, in case you should be absent. On the $5000 to be paid down, pay interest if Mason wants it. If Burr reads this, I wish him to see all is done which he can do. Send the $5000 in case you are not there to execute the papers, saying that you will execute them and return them as soon as you get home, as they can be sent to you. I do not want anything by which Mason can get out of this. He agreed that if there was any hindrance on your part, to send them to me to execute.

"The S. P. is doing finely, 30 tons a week. To-day 50 tons have been shipped, and by Monday morning there will be at the smelting works 60 tons unsmelted. I think we have a sure thing in the S. P. We must make a family concern of Ossipee, and I would not sell any stock in it. We can make it put on its own importance. This we will do. I see this matter clearly. I write in haste and do not read over.

"Truly yours, CHARLES H. PALMER.

"Be particular to say nothing about Stanton's wishes. We need not buy any Hecla unless upon good time and satisfactory prices. We shall have a Hecla of our own. I think the S. P. will improve upon what she is now doing. The 40 acres is less than 350 feet from line of vein. In case you want us to raise $5000 here, write us or telegraph, and we will use it for the mine."

Enclosed in this was a copy of the memorandum made while Mason was in Michigan. After the receipt of these letters Loring wrote and perhaps telegraphed to Palmer approving the purchase.

On the 25th of June Loring also wrote W. Hart Smith, of New York, as follows :

"OFFICE OF THE SOUTH PEWABIC COPPER COMPANY,
31 Kilby Street,
BOSTON, *June* 25, 1868.

"W. HART SMITH, Esq., *Treas., New York.*

"Dear Sir : I received letter this morning from Mr. Palmer, who is very desirous I should see Mr. Mason before leaving for the Lake, which I intended doing on Saturday, therefore telegraphed you this morning, requesting to be advised as soon as Mr. Mason returned, which I will thank you to do by telegraph at the earliest date, as this may enable me to leave here on Saturday evening's boat and see Mr. Mason on Monday morning, if not before.

"Truly yours, E. T. LORING."

Smith was the treasurer of the Quincy Mining Company, of which Mason was president. On the next day, June 26, Mason, in New York, wrote T. Henry Perkins, in Boston, as follows :

"T. HENRY PERKINS, Esq.

"Dear Sir : I send herewith contract for sale of 120 acres of land, which I wish you to [——] Mr. Loring, and have him execute, either for himself or Mr. Palmer, (I made the trade

with Palmer,) fill in the name of whichever Mr. L. desires, and deliver over to Mr. Loring upon his paying you $5000.

"If Mr. Loring is not prepared to comply, you will not press the matter, but return the papers. I was tempted to sell by the offer, but perhaps I made a mistake; probably I might obtain more from the Hecla Company by holding long enough.

"Mr. Palmer requested the transaction kept private for the present, so you will please say nothing about it.

  *      *      *      *      *      *

"Truly yours,       THOS. F. MASON."

Between the date of this letter and June 29, Perkins filled the blanks in the contract with the name of Elisha T. Loring, trustee, and Loring signed it as trustee. He also made the down payment of $5000, which was remitted by Perkins to Mason, so that he got it in New York on the 29th, and on the same day Palmer, in Michigan, received from Loring, in Boston, a telegram dated the 27th, stating that the contract had been closed and that he would start for Lake Superior the same day.

The following is a copy of the contract which was thus executed:

"This agreement made the eighteenth (18) day of June, one thousand eight hundred and sixty-eight, between Thomas F. Mason, of the city, county and State of New York, of the first part, and Elisha T. Loring, trustee, of the city of Boston, county of Suffolk, State of Massachusetts:

"Witnesseth, that said party of the first part, in consideration of the sum of twenty thousand dollars to be paid as hereinafter mentioned, hereby agrees to sell unto the said party of the second part all the following described premises, to wit: situated in the county of Houghton and State of Michigan, the north half of the northwest quarter, and the northwest quarter of the southwest quarter of section twenty-three, in township fifty-six, north of range thirty-three west; which said premises the said party of the second part hereby agree to purchase and

pay for in manner following, to wit : the sum of five thousand dollars on the execution and delivery of this instrument, the sum of seventy-five hundred dollars at the expiration of six months from the date thereof, and the sum of seventy-five hundred dollars to be paid eight months after the date thereof, with interest on the sum of fifteen thousand dollars, at and after the rate of seven per cent. per annum, from the date of this instrument till the same shall be paid.

" It is further agreed, between the parties to this instrument, that said Mason, the party of the first part, will receive the said sum of fifteen thousand dollars, or any part thereof, at any time prior to the dates of payment hereinbefore mentioned, and that, upon the payment of the entire sum of fifteen thousand dollars and interest, the party of the first part shall make, execute, and deliver to the party of the second part, or his assigns, a proper deed for the conveying and assuring to him the fee-simple of said premises free from all encumbrances, which deed shall contain a general warranty and the usual full covenants.

" It is further agreed, that said party of the second part shall be entitled to immediate possession of said lands and premises herein described, and shall pay all taxes or assessments of every name and nature assessed and imposed on said lands and premises after this date.

" It is further hereby expressly understood and agreed, that the said terms of payment mentioned in this contract are hereby made material, and that the failure to pay any of said instalments or interest on the days named for the payment thereof, shall render this contract absolutely null and void, and that any instalment paid before such failure shall, by such failure, be forfeited, and that, whatever amount may be paid, any failure of payment of any of said instalments and interest, as the same shall fall due and become payable, shall make this contract absolutely void, and all rights, interests, or titles under this contract shall be forfeited, and all and every equity and right in the said party of the second part, his heirs or assigns, shall thereby determine and become void. The clause in this contract mentioned, relative to the execution of a deed of the

said party of the second part, being, by the agreement of the parties hereto, expressly made subject to the agreement of forfeiture in case of any failure of payment of said instalments and interest, as the same shall fall due and become payable.

" It is further understood and agreed, that each and every of the stipulations hereinbefore in this contract mentioned shall apply to and bind the heirs, executors, administrators, or assigns of the respective parties.

" In witness whereof, the parties to these presents have hereunto set their hands and seals the day and year first above written.

" THOS. F. MASON.<br>" E. T. LORING, <em>Trustee.</em>

" Sealed and delivered in presence of—

" WM. HART SMITH, as to signature of T. F. Mason.

" H. F. ATWOOD, as to signature of E. T. Loring, Trustee."

On the 22d of June Palmer telegraphed from Michigan to Loring that he had paid $5000 for him, Loring, there, and asking that he pay the same amount to Mason and execute the contract. This was Frue's money, and it was afterwards so treated by all the parties. The remainder of the purchase money was paid by Loring when it became due, and as soon as the payments were made in full Mason conveyed the property as called for by the contract.

No moneys were paid by Palmer to Loring with particular instructions to use them in paying for the land, but Loring had for some years been acting as the financial agent of Palmer in Boston, and the accounts as stated by the master showed quite a considerable balance of interest in favor of Palmer at the end of the years 1867 and 1868, respectively. At first the credits to Palmer were principally from the sales of stocks, but during the years 1867 and 1868 they were mostly the proceeds of the discounts of Palmer's notes, endorsed by Loring. In the latter part of the year 1868 the credit of both the parties seems to have been somewhat impaired, and there was considerable difficulty in raising money to meet maturing obligations. The first instalment on the contract with Mason fell due December 18, 1868, and there were notes of Palmer

which had been discounted maturing about the same time to a considerable amount. To raise the means to meet these maturing obligations Palmer, at the request of Loring, sold stocks of his own, from which $15,000 in money was realized. The sale was negotiated before the instalment on the contract fell due, but the price was not paid until December 21, $5000, and December 28, $10,000. All this money was paid over promptly to Loring for Palmer's credit, and the accounts stated by the master show that on the 31st of December there was a balance due from Loring to Palmer of $17,059.25, and that there was a balance of interest account in Palmer's favor for the year of $775.55. In this statement of the account no charge is made against Palmer for any share of the purchase money under the Mason contract. On the 18th of February, 1869, when the last instalment to Mason fell due, the accounts show a balance in favor of Palmer of something more than $10,000. Between that time and March 20th this amount was substantially all used in payment of Palmer's maturing notes, but on the last date Palmer sold other stocks, from which $8000 in money was realized, and put to his credit. After that, in August, other notes were paid, and at the end of the year there was a balance against Palmer of $1065.18, though the interest account for the year showed a balance in his favor of $302.35. Here the transactions between the parties seem to have stopped, but on the 15th of March, 1872, Loring sold stocks of Palmer which he still held in his hands, from which $12,975 were realized, and afterwards during the year other sales were made, so that on the 31st of December, 1872, the accounts showed a balance in favor of Palmer amounting to $15,964.45, which included a balance of interest account in his favor since the last statement of $637.96.

In the statement of the accounts to this time, for some reason, no charge was made against Palmer for certain stocks purchased in 1867, the price of which was $6275, nor for any part of the Mason purchase, but the amount otherwise to his credit with Loring was sufficient to pay these items in full, principal and interest, and still leave a balance due Palmer at the date of the decree amounting to $527.52.

On the 16th of March, 1869, Loring, at the request of Palmer, endorsed on a copy of the contract with Mason a declaration as follows:

"BOSTON, *March* 16, 1869.

"Whereas Thomas F. Mason has deeded to E. T. Loring, in trust, the lands described in the within document, and received therefor in payment the sum mentioned therein, with the interest: Therefore be it known, for value rec'd, I hereby acknowledge that C. H. Palmer, or Wm. B. Frue, one or either of them, jointly or separately, are the owners of the undivided one fourth part of said lands, and I hereby obligate myself, heirs, and executors to account to said Palmer, or his assigns, for one fourth part rec'd for the lands in question whenever a sale shall be made of the same.

"ELISHA T. LORING.

"Witness: JAMES MOORE."

This represented the interest paid for with Frue's $5000, and Palmer obtained it at Frue's request, so that he, Frue, might have something to show for his interest in the land. Afterwards, on the 22d of May, 1869, Loring conveyed to Frue an undivided one fourth of the property, and he claims no further interest.

On the 22d of February, 1869, Loring wrote Palmer as follows:

"I therefore deem it my duty, and as an act of courtesy towards you, to notify you that whatever additional proportion you wish to secure for yourself in section 23, it will be necessary for you to remit the amount of the cost of such additional portion as you desire prior to the 20th of March, otherwise I shall consider as mine and retain the three fourths interest in section 23 which I have paid for."

In October, 1871, Loring sued Palmer for a balance claimed to be his due on general account, and the bill of particulars showed the amount demanded to be large. Nothing was claimed for payments on account of the Mason purchase. This suit was pending until June, 1874, when it was discontinued, and on the first of July, 1875, Loring conveyed the

land to Welch in trust for him, Loring, and his children. This suit was begun December 20, 1875. The Circuit Court rendered a decree in favor of Palmer, and from that decree this appeal was taken.

*Mr. Joseph H. Choate* (*Mr. C. I. Walker* was with him) for appellants.

I. The evidence was not sufficient to establish, under the statutes of Michigan, an express trust in Loring as to the lands in question, for the benefit of the complainant, to the extent of an undivided third, or any other portion of the property. Uses and Trusts, except as authorized by the statute, are abolished, and every estate and interest in lands is deemed a legal estate except as authorized: 2 Howell's Annotated Statutes, § 5563. The provisions of § 5573, Howell's Stat., are as follows:

" § 5573. Express trusts may be created for any or either of the following purposes:

" 1. To sell land for the benefit of creditors.

" 2. To sell, mortgage or lease lands, for the benefit of legatees, or for the purpose of satisfying any charge thereon.

" 3. To receive the rents and profits of lands, and apply them to the use of any person, during the life of such person, or for any shorter term, subject to the rules prescribed in the last preceding chapter.

" 4. To receive the rents and profits of lands, and to accumulate the same for the benefit of any married woman, or for either of the purposes and within the limits prescribed in the preceding chapter.

" 5. For the beneficial interest of any person or persons, when such trust is fully expressed and clearly defined upon the face of the instrument creating it, subject to the limitations as to time prescribed in this title."

The 5th provision is peculiar to the statutes of Michigan and Wisconsin. By it the sufficiency of the proof of the creation of the supposed trust must be measured.

The Michigan Statute of Frauds, which will be found in 2 Howell, § 6179, is substantially the same as that which prevails in the other States.

It must be borne in mind that we are dealing with an *express* trust created at the time of the purchase; which, of course, excludes the idea of an *implied* trust. *Mercer* v. *Stark*, Sm. & Marsh. Ch. 479; *Dunphy* v. *Ryan*, 116 U. S. 491; *Smith* v. *Burnham*, 3 Sumner, 435, 460. And see *Kellum* v. *Smith*, 33 Penn. St. 158; *Steere* v. *Steere*, 5 Johns. Ch. 1; *Olcott* v. *Bynum*, 17 Wall. 44. And, as Palmer claims under the contract, he cannot impeach it. *Jacobs* v. *Miller*, 50 Mich. 119, 126.

It is well settled that an express trust must appear with absolute certainty as to nature and terms before a court can undertake to execute it. *Steere* v. *Steere*, above cited; *Dillaye* v. *Greenough*, 45 N. Y. 438; *Slocum* v. *Marshall*, 2 Wash. C. C. 397; *Smith* v. *Matthews*, 3 De G. F. & J. 139; *Cook* v. *Barr*, 44 N. Y. 156; *Parkhurst* v. *Van Cortland*, 1 Johns. Ch. 273.

Assuming that the term "instrument" required by the Statute of Frauds to manifest or prove a trust, and by the Statute of Uses and Trusts to create it, may be broadly construed so as to include any paper writing, signed or accepted by the parties—letters, entries or written statements of any kind—the rule still remains an absolute one, from which there is no exception, that by those writings, whether one or many, the nature and terms of the trust must be clearly and explicitly expressed, and that it must by the writings clearly and unmistakably appear not only that there is a trust intended, but in whose behalf, for what purpose, and to what extent, as to the proportions of property covered by it. And it must be so clearly expressed that no other intention, no other party, no other terms, can, consistently with the language used, have been intended. To this general rule, so clearly indicated by the authorities, is added the special provision of the Michigan statutes, that the trust in a particular instance must be "*fully expressed and clearly defined upon the face* of the instrument creating it."

Clearly this requires something more than the Statute of Frauds, otherwise there was no necessity for enacting it. It means that nothing was to be left to implication; that the trust must be expressed and defined with absolute clearness on

the face of the instrument.   In the present alleged trust : (1) It is not clear who were the *cestuis que trust*.   Loring the trustee was certainly one of them.   (2) In order to establish it, it is necessary to resort to subsequent acts and conversations, and they show that (if anything) the purchase was made for the Ossipee Mining Company, not for Palmer and other stockholders.   (3) It is clear that in any event participation in the trust was dependent upon payment of a specific sum for a distinct interest.

If there may fairly be a doubt. whether the trust (if any) was created for the benefit of the Ossipee Company or of individual stockholders of that company, then the nature of the trust is not fully expressed and clearly defined on the face of the paper.   The rule requiring it to be so expressed is absolute, and in no event can resort be had to parol testimony.   *Cook* v. *Barr*, 44 N. Y. 156 ; *Shafter* v. *Huntington*, 53 Mich. 310. The *conduct* of the parties cannot be referred to.   *Railroad Co.* v. *Durant*, 95 U. S. 576 is no authority for such a reference.   The parties are bound by the face of the papers.   Parol evidence is not admissible to vary or contradict their legal effect.   *Jacobs* v. *Miller*, above cited.   See also *Ruth* v. *Oberbrunner*, 40 Wis. 238 ; *Shafter* v. *Huntington*, above cited ; *Hurst* v. *McNeil*, 1 Wash. C. C. 70 ; *Sturtevant* v. *Sturtevant*, 20 N. Y. 39 ; *Rasdall* v. *Rasdall*, 9 Wis. 379 ; 1 Perry on Trusts, § 85.

II.  If the trust alleged and found· by the court below could be read as a trust fully expressed and clearly defined upon the face of the papers creating it, so as otherwise to satisfy the requirements of the fifth subdivision of section 5573 of the Statute of Uses and Trusts of Michigan, still, it would be a naked, passive trust, and, as such, unauthorized under the provisions of that statute.   Under such a trust no function or title would rest in the trustee ; but the statute would have executed the trust immediately in the *cestui que trust*.   So that, on the conveyance being made to Loring as trustee, the statute passed the legal title immediately to the complainant, and left nothing for this court, as a Court of Equity, to do, and, least of all, the power or liberty to adjudge Loring to be a trustee for Palmer,

or to fasten, by its decree, the trust upon the land; for the statute has in express terms prohibited it. *Riehl* v. *Bingenheimer*, 28 Wis. 84. No passive trust is possible under the statutes of Michigan (nor of Wisconsin, which are similar). *Burdeno* v. *Amperse*, 14 Mich. 91; *Ready* v *Kearsley*, 14 Mich. 215; *Steevens* v. *Earles*, 25 Mich. 40, 44; *Thompson* v. *Waters*, 25 Mich. 214; *Riehl* v. *Bingenheimer*, above cited; *White* v. *Fitzgerald*, 19 Wis. 480. The statutes of Michigan on this point are:

"§ 5563. Uses and Trusts, except as authorized and modified in this chapter, are abolished, and every estate and interest in lands shall be deemed a legal right, cognizable as such in the courts of law, except when otherwise provided in this title."

"§ 5564. Every estate which is now held as in use, executed under the laws of this State as they formerly existed, is confirmed as a legal estate."

"§ 5565. Every person who, by virtue of any grant, assignment or devise, now is or hereafter shall be entitled to the actual possession of lands and the receipt of the rents and profits thereof, in law or in equity, shall be deemed to have a legal estate therein, of the same quality and duration and subject to the same conditions *as his beneficial interest.*"

"§ 5567. Every disposition of lands, whether by deed or devise, hereafter made, except as otherwise provided in this chapter, shall be directly to the person in whom the right to the possession and profit shall be intended to be vested, and not to any other, to the use of or in trust for such person; and if made to one or more persons, in trust for or to the use of another, no estate or interest, legal or equitable, shall vest in the trustee."

When afterwards section 5573 provided for the creation of express trusts to be created for any or either of the purposes specified in its five subdivisions, it certainly was not intended thereby, as to either of them, to sanction the creation of a merely passive trust, in which land should be conveyed to a trustee simply to hold in trust for a cestui que trust indefinitely without any limit of time. For this would be absolutely to nullify sections 5563, 5565 and 5567, and defeat the whole policy of the statute, which was to abolish mere formal trusts,

which separate the legal and equitable estate for no purpose that the law ought to sanction, by converting them into legal estates. N. Y. Revisers' Notes, 5 Edmunds, N. Y. Stat. at Large, p. 320. See also Perry on Trusts, § 298; *Goodrich* v. *Milwaukee*, 24 Wis. 422; *Ruth* v. *Oberbrunner*, cited above; *Dodge* v. *Williams*, 46 Wis. 70, 100; *Smith* v. *Ford*, 48 Wis. 115.

Even where a trust is created, in express terms, simply "*to convey*" to appointees or beneficiaries, it is held to be a passive trust, and the statute transfers the legal title immediately, no conveyance from the so-called trustee being either necessary or proper. *Matter of Winter*, 24 N. Y. 555, 567; *Clark* v. *Davenport*, 1 Bosworth, 95, 114–115.

The bill makes no case for equitable relief. It asks for an injunction, but there was nothing to enjoin. It asks for no accounting. It only asks for a conveyance of an interest in land to which it alleged the complainant is entitled. The answer sets up no lien. It only demands the dismissal of the bill. When the court on the final hearing found that there was no lien, it should have dismissed the bill. *Hipp* v. *Babin*, 19 How. 271, 278; *Killian* v. *Ebbinghaus*, 110 U. S. 568, 573; *Sullivan* v. *Railroad Co.*, 94 U. S. 806, 811; *Root* v. *Railway Co.*, 105 U. S. 189, 212–215; *Fussell* v. *Gregg*, 113 U. S. 550, 555. It is well settled in Michigan that the action of ejectment is the only action for the determination of questions of legal title to land. The controversy cannot be carried into a court of equity under any circumstances. *Michigan Cent. Railroad Co.* v. *McNaughton*, 45 Mich. 87; *Kinney* v. *Harrett*, 46 Mich. 87; *Cleland* v. *Taylor*, 3 Mich. 201–207; *Hoffman* v. *Beard*, 22 Mich. 52, 62, 67; *Hemingway* v. *Griswold*, 22 Mich. 77; *Shaw* v. *Chambers*, 48 Mich. 355, 358, 360. In this suit the court is administering the laws of that State. *Brine* v. *Ins. Co.*, 96 U. S. 627; *Bendey* v. *Townsend*, 109 U. S. 665.

III. Neither does the bill claim, nor the evidence establish, any trust in Loring by implication of law. No such trust is set up in the bill, or was set up in argument below. No resulting trust is possible under the statutes of Michigan. *Lloyd* v. *Spillett*, 2 Atk. 148, 150; opinion of Lord Hardwicke; *Brown* v. *Bronson*, 35 Mich. 415. Palmer could not call upon Loring

to convey to him after having directed Mason to convey to Loring. *Bumpus* v. *Bumpus*, 53 Mich. 346; *Week* v. *Bosworth*, 61 Wis. 78; *Sturtevant* v. *Sturtevant*, above cited; *Hunt* v. *Roberts*, 40 Maine, 187.

It has often been held that when the legal title to an estate is procured through the means of an actual or constructive fraud, equity will give relief to the party defrauded by giving the estate the direction which it would have taken had the fraud not been committed. So it has been held that if a grantee or devisee obtain a deed or devise by means of promises made to the grantor or devisor, to hold the land for another, this is sufficient to raise a trust in favor of the latter, on the ground of fraud, and that this may be proved by parol. Also, that where a party obtains the conveyance of property by abuse of confidence reposed in him, he is converted into a trustee *ex maleficio*. Also, that a purchase in his own name, contrary to the intent of his principal, by an agent undertaking to purchase for his principal, converts the agent into a trust *ex maleficio*. Also, that where a person, professing to be acting on behalf of a mortgagor or execution debtor, undertakes to purchase in the property at execution or foreclosure sale for the benefit of the debtor, and having thereby led the latter into relaxing his own exertions, and by this means procuring the title at less than its value, afterwards refuses to carry out his agreement, he shall be held in equity to be a trustee for the debtor. But this case has no relation to any of the cases thus referred to. It has no element in common with them. It lacks the vital element that in all those cases has been held to serve as the foundation for a trust. See *Ryan* v. *Dox*, 34 N. Y. 307; *Huxley* v. *Rice*, 40 Mich. 73; *Shafter* v. *Huntington*, above cited; *Kellum* v. *Smith*, 33 Penn. St. 158; *Fickett* v. *Durham*, 109 Mass. 419; *Phillips* v. *Hull*, 101 Penn. St. 567; *Levy* v. *Brush*, 45 N. Y. 589; *Wheeler* v. *Reynolds*, 66 N. Y. 227; *Wood* v. *Rabe*, 96 N. Y. 426. A fraud to create a trust in equity, must be something more than the mere breach of a parol trust. *Rasdall* v. *Rasdall*, above cited. See also, *Coble* v. *Cook*, 49 Mich. 11; and *Smith* v. *Burnham* and *Steere* v. *Steere*, cited above. It is not sufficient to show by parol that one bought with his own

money for the use of another, for that would be to overturn the Statute of Frauds. *Blair* v. *Bass,* 4 Blackford, 539, 545; *Botsford* v. *Burr,* 2 Johns. Ch. 405.

See also, *Hunt* v. *Roberts,* above cited; *Fickett* v. *Durham,* above cited; *Parsons* v. *Phelan,* 134 Mass. 109; *Purcell* v. *Miner,* 4 Wall. 513; *Dunphy* v. *Ryan,* above cited; *Fischli* v. *Dumarschey,* 3 A. K. Marsh (Ky.), 24; *Randall* v. *Howard,* 2 Black, 585, 589; *Moote* v. *Scriven,* 33 Mich. 500, 504; *Taylor* v. *Boardman,* 24 Mich. 287; *Allen* v. *Withrow,* 110 U. S. 119, 139.

IV. In view of the long continued acquiescence of the complainant in Loring's disavowal of all interest on complainant's part in the lands in controversy, and of complainant's gross and unexcused laches in the presentation of his claim, the court, as a court of equity, should have dismissed the bill.

The character of the property, being mining and speculative, and the conduct of the parties in dealing with it, may be properly looked at in considering the doctrine of acquiescence and laches. If on receipt of the letter of February 22, Palmer had replied that he acquiesced in the notice, the answer would have terminated his interest in the land. There is nothing in the nature, even of an express trust, where the title stands upon a deed which does not disclose the interest of the *cestui que trust,* to prevent a surrender of his interest by such a step. *Seymour* v. *Freer,* 8 Wall. 202. We submit that the fact of Palmer's acquiescence in Loring's disclaimer of all interest on his part is as clearly established as if Palmer had in so many words written to that effect in reply. On the question of acquiescence and laches we cite *Russell* v. *Miller,* 26 Mich. 1; *Clegg* v. *Edmonds,* 8 DeG. M. & G. 787; *Hume* v. *Beale,* 17 Wall. 336; *Seymour* v. *Freer,* above cited; *Nettles* v. *Nettles,* 67 Ala. 599, cited with approval in *Phillippi* v. *Phillipe,* 115 U. S. 151; *Sullivan* v. *Portland & Kennebec Railroad Co.,* 94 U. S. 806; *Brown* v. *Buena Vista County,* 95 U. S. 157; *Godden* v. *Kimmell,* 99 U. S. 201; *Germ. Am. Seminary* v. *Kiefer,* 43 Mich. 105; *Hayward* v. *National Bank,* 96 U. S. 611; *Grymes* v. *Saunders,* 93 U. S. 55; *Evan's Appeal,* 81 Penn. St. 278; *Twin Lick Oil Co.* v. *Marbury,* 91 U. S. 587; *Rule* v. *Jewell,* 18 Ch.

Div. 660; *Allen* v. *Allen*, 47 Mich. 74; *Pratt* v. *Cal. Mining Co.*, 9 Sawyer, 354; *Harlow* v. *Lake Superior Iron Co.*, 41 Mich. 583; *Haff* v. *Jenney*, 54 Mich. 511. Laches need not be pleaded. *Sullivan* v. *Portland & Kennebec Railroad Co.*, 94 U. S. 806; *Nettles* v. *Nettles*, 67 Ala. 599.

*Mr. Ashley Pond* and *Mr. George F. Edmunds* (*Mr. Hoyt Post* was with them on the brief) for appellee.

Mr. Chief Justice Waite after stating the case as above reported, delivered the opinion of the court.

The question which meets us at the outset is whether the trust in favor of Palmer, on which the case depends, has been sufficiently established. A statute of Michigan provides that " express trusts may be created for any or either of the following purposes :

\* \* \* \* \* \* \*

" 5. For the beneficial interest of any person or persons, when such trust is fully expressed and clearly defined upon the face of the instrument creating it, subject to the limitations as to time prescribed in this title." 2 Howell's Ann. Stat. § 5573, p. 1448.

The trust relied on is an express trust, and it relates to lands in Michigan. Consequently it must be established according to this statute, which it is contended requires proof of the *creation* of the trust by a written instrument that shall clearly express and fully define on its face the rights of the respective parties thereto. It is not enough, as is claimed, to show the existence of the trust by writing. The proof must be that it was originally created by a written instrument sufficient in form. In the view we take of the case it is unnecessary to inquire whether this is the true rule or not, for, in our opinion, the evidence is sufficient to meet all these requirements.

We do not understand it to be denied that the letters of Palmer to Loring under date of June 18 and June 19; the memorandum of the agreement made in Michigan at the time of the negotiations by Palmer and Frue with Mason for the purchase, and which was sent by Palmer to Loring in the letter of June

19 ; the telegram and letter from Loring to Palmer before the contract between Mason and Loring, trustee, was executed ; the letter from Loring to Smith, under date of June 25 ; the letter from Mason to Perkins under date of June 26 ; and the contract between Mason and Loring, may all be read together as one instrument for the purpose of establishing the trust. If, upon the face of these writings thus read and construed together in the light of the circumstances which surrounded the parties at the time, a trust is fully expressed and clearly defined for the beneficial interest of Palmer, then his case has been made out so far as the creation of the trust is concerned.

We begin, then, with the fact that Loring, Palmer, and Frue had been operating together for some years in buying mining lands, forming mining corporations, and selling mining stocks. Very generally the titles, both of lands and stocks, had been, during all the time, taken and held in the name of Loring, as trustee for all concerned. Each party paid for his own share of the purchases, but Loring was the principal capitalist, and both Palmer and Frue relied on him to raise money for them to meet their obligations when necessary. This particular purchase was set on foot by Palmer and Frue, and it was a kind of property in which the parties had been in the habit of dealing. It adjoined or was near to other property in which they were all largely interested at the time, and which they were jointly engaged in advancing in value. The writings are to be read and construed in the light of these facts.

The contract of purchase, as reduced to writing and finally executed, is in the name of Loring, trustee. This on its face implies that it was made by him for the beneficial interest of others besides himself, in whole or in part. Standing alone, it does not " clearly define " the trust which it apparently created but, taken in connection with the correspondence which preceded it, and out of which it confessedly arose, no room is left for doubt that it was made for the benefit of the three persons who had been so long operating together in that kind of property. Palmer, in his letters acquainting Loring with what he and Frue had done in Michigan towards the purchase, says, " it is a fortune to us if well handled ; " " when I present the whole

matter you will see how important it is to us. We can take
from Hecla from 1550 to 2305 feet in length, and still give
them out of this purchase double the amount of mining value
that we get from them. The fact is, this ground bought is
worth more to them than the ground next to Ossipee. It is
for this reason that I do not want anything said till we have
fully considered this matter together, and see how we shall
open it to Shaw. . . . Hecla would be free then to give us
100 acres, 50 of which would carry the vein, and we should give
them 100, all of which would carry the vein. You will see the
importance of this matter, and that we should not say anything
until we consult. The Hecla is rich, and we can make the Os-
sipee as rich." And again, " we shall get out of Hecla all I
have indicated. The land we would exchange is more conven-
ient on surface and underground for them than what they
would give us. It will be under their machinery and improve-
ments. This is a great thing for Ossipee."

It is said, however, that Frue does not appear to have been
included as one of the beneficiaries. He was one of those who
had been operating together, and Palmer, in his letter, speaks
of him as having been present when the negotiations were had
with Mason in Michigan. The language on this subject, in the
letter of June 19, is: " Mason talked this matter over with Frue
and myself, and says we shall have this land as agreed, and that
his word is as good as his deed;" and, besides, in the memo-
randum of the agreement, made at the time of the negotiation,
either Palmer and Frue were named as vendees, or Charles H.
Palmer and his associates, which, under the circumstances,
would imply the same thing.

Again, it is said that the individual interests of the respective
beneficiaries are not stated, and, therefore, that the trust is not
sufficiently defined to meet the requirements of the statute;
but the rule in Michigan, as well as in other States where
the principles of the common law prevail, is that where a con-
veyance of lands is made to two or more persons, and the
instrument is silent as to the interest which each is to take, the
presumption will be that their interests are equal. *Campau* v.
*Campau*, 44 Mich. 31, 34; *Eberts* v. *Fisher*, 44 Mich. 551, 553,

Under this rule the purchase by Loring, as trustee, was for the equal benefit of the three parties in interest, and the trust, therefore, enured in that way. Without doubt it was expected that each of the parties would pay for his own interest, and that as between themselves neither should be bound for the other; but that is a matter the effect of which need not now be considered, as Palmer has paid for his share in full. There is nothing whatever on the face of the papers to indicate that at the time the contract was made and the trust created it was expected that one should have a greater interest in the purchase than another.

Finally, it is claimed the letters show that the purchase was made for the Ossipee Company, and not for Loring, Palmer, and Frue individually. We cannot so read what was written. The Ossipee Company had been promoted by these parties. They had bought the land which was made the basis, in whole or in part, of its organization. They were at the time of the purchase from Mason the three largest stockholders. The Ossipee was a corporation, and it nowhere appears that these parties, or either of them, had ever been authorized to make the purchase on its account. There is no doubt that all the parties expected to handle the property with a view to an enhancement of the value of Ossipee stock, but there is nothing whatever to indicate that the corporation was to be in any way directly interested in the purchase. The land might have been, and undoubtedly was, necessary to the complete success of the company, but it was nevertheless when bought the property of the purchasers, who occupied no such trust relations to the company as to make their purchase enure directly to its benefit; and, besides, the company is not now seeking to charge them as trustees. Palmer does, indeed, say in his letter to Loring, "the purchase will add to the Ossipee $5 per share at once in actual value," and "we must make a family concern of Ossipee, and I would not sell any stock in it; we can make it put on its own importance; this we will do; I see this matter clearly;" and "we shall have a Hecla of our own;" but this does not make Ossipee the purchaser, or the direct beneficiary under the trust as thus created and defined. The

expectation of an indirect benefit to their investments in Ossipee was undoubtedly great, but nothing occurred to bind the company to the purchasers or the purchasers to the company.

We conclude, therefore, that the original trust in favor of Palmer for a one-third interest in the property has been sufficiently established.

It is contended, however, that if the conveyance was made to Loring as trustee for himself and Palmer and Frue, then, under the statutes of Michigan, the legal title vested at once in the beneficiaries, and the remedy of Palmer is at law, and not in equity, because he holds the legal title to his share and not an equitable title merely. The statute referred to is as follows:

"§ 5567. Sec. 5. Every disposition of lands, whether by deed or devise, hereafter made, except as otherwise provided in this chapter, shall be directly to the person in whom the right to the possession and the profits shall be intended to be vested, and not to any other, to the use of, or in trust for, such person; and if made to one or more persons, in trust for, or to the use of another, no estate or interest, legal or equitable, shall vest in the trustee." 2 Howell's Ann. Stat. 1446.

This, it has been held, abolishes all express passive trusts in Michigan, but allows express active trusts when created in accordance with § 5573, cited above. *Burdino* v. *Amperse*, 14 Mich. 91, 96; *Ready* v. *Kearsley*, 14 Mich. 215, 227; *Steevens* v. *Earles*, 25 Mich. 40, 44; *Thompson* v. *Waters*, 25 Mich. 214, 234; *Goodrich* v. *Milwaukee*, 24 Wis. 422, 430. But here the conveyance under which Loring took the title that he has since conveyed to Welch did not create the trust in favor of Palmer. That was done by the original contract of purchase from Mason, read in connection with the contemporaneous correspondence between the parties, and the object of this suit is to charge Loring as trustee under that contract, and to compel him and his grantee to perform the trust which was then created. There is nothing on the face of the deed to Loring to show that Palmer is the person for whom Loring took title in trust. The legal title did not, therefore, vest in him by that conveyance. All he has is the equitable title which he acquired under the contract of purchase, and his purpose now is to com-

pel Loring to convey to him the legal title to his share which passed from Mason when the contract was performed and the deed executed to him in accordance with its provisions. This is relief which a Court of Chancery alone can afford. So far as this record shows, Mason knew nothing of the particulars of the arrangement between Loring, Palmer, and Frue as to their respective interests. It is true the contract was made with Loring as trustee, but that is all. The terms of his holding are nowhere explained, and Mason performed his duty towards all who were interested, when he conveyed to Loring in accordance with the terms of the contract. The deed was intended to and did vest in Loring the legal title in trust for whomsoever it might concern. This suit is prosecuted to establish the fact that Palmer was one of the persons concerned and to charge Loring accordingly.

The trust having thus been established and the jurisdiction of a court of equity over the subject-matter of the suit sustained, it remains only to consider whether the trust, which was originally created, has been abrogated by abandonment or laches. The last payment to Mason was made February 18, 1869, and this suit was not brought until December 20, 1875.

This branch of the case is presented to us very differently from what it was to the court below when the interlocutory decree was rendered, and the cause referred to a master to ascertain how much was due from Palmer to Loring upon the purchase money paid to Mason. It was then supposed that Palmer had no money in the hands of Loring which could be used to pay on the land when the deferred instalments fell due. The court then found that no part of the proceeds of the smelting stock or the Hecla stock was applied to such payment, and that all went into Palmer's general account with his consent. It now appears that when each of the instalments was paid, or very soon thereafter, Palmer had, or ought to have had, a balance to his credit much more than sufficient to meet his share of what was due. The testimony shows very clearly that neither of the parties had a correct understanding of the state of their accounts with each other at the time. Palmer kept no books of his own, and those of Loring were not at all reliable.

Loring always claimed that Palmer was largely in his debt, and Palmer does not seem to have had then any means of showing the contrary. His own credit was exhausted, and Loring had possession of all his securities. Consequently, when Loring called on him to pay by the 20th of March, he did not abandon his claim, but he sold his Hecla stock and paid the proceeds to his general credit and waited for time to show whether this was enough to preserve his interest or not. He gave no special direction for its application, but, under the circumstances, the law will apply it to the only debt he then owed to Loring, and that was his share of this purchase money. Loring, by keeping the charge for the purchase money out of his accounts, cannot deprive Palmer of his right to the application of his credits. In a couple of years or so Loring began his suit, and this was kept pending until 1874, when it was discontinued. Loring says, in his answer, this was because he had " ascertained that Palmer was utterly irresponsible and worthless." Now it turns out that when the suit was abandoned, he was himself in debt to Palmer, and that all the time he had securities in his hands which were largely in excess of any amount he had paid for Palmer on the land or otherwise. Under these circumstances it is impossible to say that the evidence makes out a case of actual abandonment, or that Palmer has been guilty of such laches as to bar him of the equities which are now so clearly shown to have existed in his favor all the time. His delay in bringing the suit is to be construed in connection with the uncertainty that existed as to the true situation of his accounts. Loring must have known that Palmer relied on him to keep the accounts, and having himself been guilty of such glaring errors in his statements and in his claims, Palmer is not to be charged alone with the fault of delay. The same explanation applies to his failure to respond more definitely to the letter of Loring under date of February 22, if there was in fact any such failure. He did, however, by the sale of his Hecla stock, put Loring in funds to an amount sufficient to meet his entire share of the purchase money, and that too on the very day he was required to do so by this letter of Loring. This renders it unnecessary to consider the conflicting testimony on the subject of the letter.

The explanation also applies to the correspondence in reference to the declaration of trust in favor of Frue under date of March 16, 1869. It is clear that, if Palmer had known the actual condition of the accounts at the time, he would promptly have claimed his rights, and that, to say the least, Loring was as much responsible for this uncertainty as Palmer. If the land had not in fact been paid for by Palmer, the delay in bringing the suit, or otherwise asserting the claim with distinctness, would have been looked upon very differently. As it is, it does not make out a defence by Loring to the enforcement of the trust which has been so clearly established.

The decree of the Circuit Court is

*Affirmed.*