## O'MEARA v. COMMISSIONER OF INTERNAL REVENUE. NATIONAL BANK OF TOPEKA v. SAME. ELMHURST INV. CO. v. SAME.

Circuit Court of Appeals, Tenth Circuit.
August 19, 1929.

Nos. 76, 77, 79.

T. M. Lillard, of Topeka, Kan. (Bruce Hurd and O. B. Eidson, both of Topeka, Kan., on the brief), for appellants.

Millar E. McGilchrist, Sp. Asst. to Atty. Gen. (Mabel Walker Willebrandt, Asst. Atty. Gen., Sewall Key, Sp. Asst. to Atty. Gen., and C. M. Charest, Gen. Counsel, Bureau of Internal Revenue, and P. S. Crewe, Sp. Atty., Bureau of Internal Revenue, both of Washington, D. C., on the brief), for appellees.

Before LEWIS, COTTERAL, and PHILLIPS, Circuit Judges.

PHILLIPS, Circuit Judge. These are appeals from decisions of the Board of Tax Appeals. The facts, as disclosed by the findings of the Board of Tax Appeals, the stipulation of facts filed in the proceeding before the board, and the oral testimony of three witnesses given at the hearing before the board, are as follows:

The board found: That on and prior to March 31, 1919, certain oil and gas leases in Marion county, Kansas, were owned by the following persons as tenants in common in the following proportions: S. W. Forrester, 29/96; C. W. Horn, 12/96; N. B. Burge, 5/96; C. B. Burge, 1/96; C. A. O'Meara, 1/96; Elmhurst Investment Company, a corporation, 48/96. That such persons, on September 1, 1919, completed a test well on one of these leases which resulted in a dry hole. That such persons, on February 4, 1919, completed a second well on another of these leases, which came in with a flush production of about 1,200 barrels per day. That such persons, on March 31, 1919, entered into a written contract to organize a corporation to take over and operate such oil leases and to market and sell the oil therefrom.

The findings of the board set out such contract in full. This contract described the oil and gas leases; it recited that the above mentioned persons were the owners thereof in the proportions above set out; that such persons had found it inconvenient to make

contracts and to transact business with reference to the development and operation of such oil properties, under such diverse ownership thereof.

The contract provided that it was "agreed by and between said owners that for the purpose of placing the title to said leases under a single ownership, and for greater convenience in making contracts and doing business, that a corporation be created for the purpose of *taking the title to said properties, holding and developing the same, and disposing of the products therefrom, all in the interest of the present owners thereof.*" (Italics ours.)

It further provided that such corporation was to be incorporated under the laws of Kansas; that it was to have a capital stock divided into 50,000 shares, of the par value of $100 each; that after the organization of the corporation such persons would convey to it their respective interests in such oil and gas leases, and that stock of the corporation should be issued to such persons "for the purpose of *representing our respective interests in said property,* in exact proportion thereto, in amounts as follows:

```
Elmhurst Investment Co............... 23,040 shares
S.  W.  Forrester........................ 13,920    "
C.  W.  Horn............................  5,760    "
N.  B.  Burge ..........................  2,400    "
C.  A.  O'Meara..........................   480    "
C.  B.  Burge............................    480    "
                                         ――――――
   Total ........................... 46,080 shares"
```

It further provided "that any moneys required for the development of these properties" should be furnished by such persons "in proportion to their respective interests therein."

The board further found that the Orlando Petroleum Company was incorporated April 15, 1919, under the laws of Kansas, with its principal office at Topeka, Kan., and with an authorized capital stock of 50,000 shares, of the par value of $100 each; that at a meeting of the stockholders of the Orlando Company, on April 15, 1919, the contract above referred to was treated as a proposal and a resolution was adopted reciting and accepting such proposal to transfer the leases in consideration of the delivery of the certificates of capital stock of the Orlando Company; and that the resolution further provided that the transfer of the leases should include the transfer of drilling rigs, casing, tools and other personal property on the leases or used in connection therewith, and also the office furniture and fixtures owned by such persons, located in their office at Peabody.

The board further found that the oil leases, described in the contract, were assigned to the Orlando Company with the exception of one lease known as the Holman lease, which had theretofore been sold; that the consideration received for the sale of the Holman lease was paid to the Orlando Company and that the stock was issued in the proportions provided for in the contract of March 31st.

The board further found that the Orlando Company had no assets whatever prior to the transfer of the leases and personal property; that, after the transfer of the leases and personal property to the Orlando Company, such persons owned all the issued capital stock thereof and were in absolute control thereof; that $105,423.21 was the cost of the property transferred by such persons to the Orlando Company; that the parties had agreed that $1,096,339.87 was the fair market value, on April 15, 1919, of the leases and equipment transferred to the Orlando Company, but had stipulated that such agreement should not be taken as an admission that the stock received therefor had a fair market value of that or any other amount; and that the Commissioner determined the fair value of the stock of the Orlando Company on the basis of the market value of the assets transferred to the corporation in exchange for its stock and found that a taxable gain had been realized on April 15, 1919, by each of the appellants, equal to the difference between the cost of his or its proportionate interest in the assets transferred and the value so determined of his or its proportionate interest in the stock, and entered a deficiency against each appellant accordingly.

The board further found that none of the stock was sold at or about April 15, 1919, nor were there any offers to sell or offers to buy at or about such date.

The stipulation of facts before the board showed that the leases were located in township 22, range 4 east of the sixth principal meridian in Marion county, Kansas, within a radius of 2½ miles from the discovery well.

C. M. Clark testified that in April, 1919, he was acquainted with the Peabody field, where these leases were located; that there was no market for the stock of the Orlando Company at that time; that he was in a position to know if there had been a market; that none of the Orlando Company's stock had been offered for sale; that none of it had been sold; that the discovery well was on the Joliffe land in section 9, but that it was not a profitable producer; that the first

profitable well was on the Gillette land and that it was the only producing well in the field when the Orlando Company was organized; and that the nearest well was nine miles away in another field.

C. A. O'Meara testified that there was no market for the stock of the Orlando Company; that the stock was speculative in character; that none of the stock had been offered for sale and that he knew of no person offering to buy it; that there were transactions in oil leases but he knew of no transactions in stock; that he knew of no person who was in the market to buy Orlando Company's stock; that he knew of no place where he could have realized cash for his stock; and that he could not have sold his stock in the Orlando Company.

M. C. McCreevy testified that he was a member of a brokerage firm which had offices in Wichita, Oklahoma City, and Bartlesville; that in April, 1919, there was no market for the stock of the Orlando Company; and that he was prejudiced against such stock.

The board held that the determination, by the Commissioner, of the value of the stock on the basis of the fair market value of the assets transferred to the Orlando Company was justified, and that each of the appellants derived a taxable gain or income from the transfer of such assets in the amounts determined by the Commissioner.

Counsel for the appellants contend:

First. That the transfer of such assets to the Orlando Company was neither a sale nor exchange of property within the meaning of the Revenue Act of 1918.

Second. That the transaction did not result in a taxable gain or income to the parties making such transfer.

Third. That the stock did not have a fair market value within the meaning of section 202 (b) of the Revenue Act of 1918 (40 Stat. 1060), and therefore the transaction did not result in something of exchangeable value proceeding from the property and severed or rendered severable from the capital.

Counsel for the Commissioner contend that a taxable gain accrued to the appellants under the principles announced in Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, United States v. Phellis, 257 U. S. 156, 42 S. Ct. 63, 66 L. Ed. 180, Rockefeller v. United States, 257 U. S. 176, 42 S. Ct. 68, 66 L. Ed. 186, and Cullinan v. Walker, 262 U. S. 134, 43 S. Ct. 495, 67 L. Ed. 906.

In Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 193, 64 L. Ed. 521, 9 A. L. R. 1570, the court defined "income" as follows: " 'Income may be defined as the gain derived from capital, from labor, or from both combined,' provided it be understood to include profit gained through a sale or conversion of capital assets."

In amplifying this definition, the court said that income was *"not a gain accruing to* capital; not a *growth* or *increment* of value *in* the investment; but a gain, a profit, something of exchangeable value *proceeding from* the property, *severed from* the capital, however invested or employed, and *coming in,* being *'derived'*—that is, *received* or *drawn by* the recipient (the taxpayer) for his *separate* use, benefit and disposal."

In applying this definition, in the case of Merchants' L. & T. Co. v. Smietanka, 255 U. S. 509, at page 519, 41 S. Ct. 386, 389, 65 L. Ed. 751, 15 A. L. R. 1305, the court said: "Since the fund here taxed was the amount realized from the sale of the stock in 1917, less the capital investment as determined by the trustee as of March 1, 1913, it is palpable that it was a 'gain or profit' 'produced by' or 'derived from' that investment, and that it 'proceeded,' and was *'severed'* or *rendered severable, from it, by the sale for cash,* and thereby became that 'realized gain' which has been repeatedly declared to be taxable income within the meaning of the constitutional amendment and the acts of Congress." (Italics ours.)

As applied to income derived from the sale or exchange of capital assets, it will be observed that the definition contains two elements: (1) A gain produced by or derived from capital. (2) A severance of such gain from the capital and receipt thereof by the taxpayer for his separate use, benefit and disposal.

The consideration received for the sale or exchange must be cash or its equivalent, because there could be no severance unless the consideration received for the sale or exchange is of a character which would permit the segregation of the portion which represents capital from the portion which represents gain or profit.

In the case of Marr v. United States, supra, where there was an exchange of stock in one corporation for stock in a newly organized corporation, which took over the assets and liabilities and the business enterprise of the first corporation, the court held that taxable income resulted because the new corporation was essentially different from the old and the stock of the new corporation was an

essentially different thing from stock in the old corporation. However, it should be kept in mind that in the Marr Case the question of whether the stock in the new corporation had a market value and was the equivalent of cash was neither presented nor considered and the stock of the new corporation was a listed stock, which could be readily sold and turned into cash.

The business enterprise here involved was the development and operation of certain oil leases and the marketing and sale of the products therefrom. This business enterprise remained exactly the same after the transfer.

Before the transfer, /the title to the oil leases was held by the several lessees as tenants in common and the business enterprise was operated by them as a copartnership or joint enterprise. After the transfer, the oil leases were held by the corporation and the business enterprise was operated and carried on by the corporation.

Before the transfer, the interests of the parties in the oil leases and in the business enterprise were represented by their several undivided interests in the lease contracts and they shared in the profits in proportion to such interests. After the transfer, the interests of the parties were evidenced by shares of stock in the corporation in exactly the same proportion as their respective undivided interests in the oil and gas leases.

Before the transfer, the parties were handicapped with difficulties in making contracts and transacting business resulting from their ownership, as tenants in common, of the undivided interests in the oil leases and were subject to personal liability for obligations of the copartnership or joint enterprise. After the transfer, the parties received the benefit of corporate management in carrying on the business enterprise and, under the construction placed upon the contract by counsel for the Commissioner, were exempt from personal liability for the debts and obligations of the corporation.

Therefore, in the instant case, the corporation is essentially different from the tenancy in common and the copartnership or joint enterprise and the shares in the corporation are essentially different from the undivided interests in the leases as tenants in common and in the business as partners or owners of joint enterprise.

[1] In our opinion, these facts differentiate the instant case from Eisner v. Macomber, 252 U. S. 189, 40 S. Ct. 189, 64 L. Ed. 521, 9 A. L. R. 1570, and Weiss v. Stearn, 265 U. S. 242, 44 S. Ct. 490, 68 L. Ed. 1001, 33 A. L. R. 520, and bring it within the rule laid down in

Marr v. United States, 268 U. S. 536, 45 S. Ct. 575, 69 L. Ed. 1079, provided the shares of stock received in exchange for oil leases had a market value or price and there was a transfer of the beneficial or equitable as well as the legal title in the oil and gas leases to the corporation.

Counsel for appellants urge that there was no sale to the corporation; that the corporation merely took the legal title as trustee for the owners of the several oil leases. They base this contention largely upon the provisions contained in the proposal which was accepted by the resolution of the corporation. Such proposal recited that the corporation was to be created for the purpose of taking title to the oil properties and holding, developing and disposing of the products therefrom all in the interest of the individual owners of such oil and gas leases. It provided that stock should be issued to such individual owners for the purpose of representing their respective proportionate interests in such oil and gas leases. It further provided that such individual owners should advance the necessary moneys required for the development of the leases, in proportion to their respective interests in such leases.

On the other hand, counsel for the Commissioner contend that the leases were assigned outright and that the language of the proposal, embodied in the contract of March 31st, could not control the legal effect of the contracts of assignment and certificates of stock issued by the corporation.

[2] The declaration of trust need not be contained in the instrument which transfers the legal title. It may be set forth in a separate instrument or in several instruments, provided they are related to and connected with each other and, when construed together, establish the existence of the trust. Kintner v. Jones, 122 Ind. 148, 23 N. E. 701; Williams v. Williams, 118 Mich. 477, 76 N. W. 1039; Tenney v. Simpson, 37 Kan. 579, 15 P. 512, 518; Ransdel v. Moore, 153 Ind. 393, 53 N. E. 767, 53 L. R. A. 753; Hodge v. Joy, 207 Ala. 198, 92 So. 171, 177, 178; Smith v. Hainline (Mo. Sup.) 253 S. W. 1049, 1051, 1052; Loring v. Palmer, 118 U. S. 321, 339, 340, 6 S. Ct. 1073, 30 L. Ed. 211. Therefore, as between the parties and the corporation, the proposal, the resolution of acceptance, the assignments and the certificate of stock constituted one transaction and the intent of the parties must be gathered from an examination of all of these instruments. We conclude that these instruments, considered together, manifest an intention to transfer to the corporation the legal title to the leases and

personal property used in connection therewith, as a managing trustee, and to retain the equitable title to such property in the assignors.

Counsel for appellants further urge that the shares of stock had no market value, that they were not the equivalent of cash; that no severance of profits occurred, and that therefore no income was derived, within the definition laid down in Eisner v. Macomber, supra.

Counsel for the government admit that there were no sales, no offers to sell and no offers to buy, but insist that, since the leases had a market value, the stock also must have had a market value at least equal to that of the leases, and that, where there is no actual market value for corporate stock, intrinsic value may be resorted to for the purpose of estimating market value. They further contend that the burden of proving the absence of a market value was upon appellants, citing Wickwire v. Reinecke, 275 U. S. 101, 48 S. Ct. 43, 72 L. Ed. 184, and Avery v. Commissioner (C. C. A.) 22 F.(2d) 6, 55 A. L. R. 1277, and that appellants did not meet this burden of proof.

■ It seems clear to us that stock for which there is no market—which could not be sold or could not be sold for an amount reasonably approximate to its real or intrinsic value—has no market value within the meaning of section 202(b) of the Revenue Act of 1918. It seems equally clear to us that such stock, which would have to be sacrificed by the holder in order to convert it into cash, does not have an exchangeable value within the meaning of the definition laid down in Eisner v. Macomber, supra. Such was the holding in Bourn v. McLaughlin (D. C. Cal.) 19 F.(2d) 148; Tsivoglou v. United States (C. C. A. 1) 27 F.(2d) 564; Id. (C. C. A.) 31 F.(2d) 706. See, also, Holmes, Federal Taxes, § 332, p. 597; Id. § 337, p. 620.

■ Section 202(b) provides that "the property received in exchange shall for the purpose of determining gain or loss be treated as the equivalent of cash to the amount of its fair market value, if any." Under this section, where property is exchanged for other property, there is no taxable gain unless the property received in exchange has a value realizable in money's worth. If the property received in exchange does not have such a value, the exchange leaves the taxpayer where he was before the exchange. Such must be the construction of section 202(b) if it is to be brought within the definition of "income" as laid down in Eisner v. Macomber, supra, because, if the value of the property received in exchange cannot be realized in money, then the profit in the transaction is not susceptible of being severed from the capital.

■ No doubt cases may arise where intrinsic value may be resorted to for the purpose of establishing market value. For example, where stock is closely held and there are no sales thereof on the open market but where, from proven facts and circumstances, there could be no doubt of the existence of a market for the stock at a fair price if the same were offered for sale. In such case, however, it would be necessary to show not only that there were no sales which reasonably reflected the market value but that there would be a market value if the stock were offered for sale. Holmes, Federal Taxes (6th Ed.) p. 620, § 337.

■■ The deficiencies made by the Commissioner were prima facie correct and the burden of showing lack of market value rested upon appellants. The question remains: Did they meet this burden? The proof showed that the Commissioner determined the market value of the shares solely from the market value of the leases and took no other elements into consideration; that there were no sales of the stock and no offers to buy it; that it was assessable under the provisions of the contract of March 31; that it was highly speculative; that prejudice existed against stock of such character; that oil leases could be sold but that stock could not be sold.

A negative is always difficult to establish, but we think appellants sustained the burden of proof and established that the stock in question could not have been sold at a price approximating what the Commissioner determined to be its intrinsic value.

It is our conclusion that the deficiencies should be set aside in so far as they were based upon the transfer of the oil and gas leases to the Orlando Company.

■ The Elmhurst Case presents one other question: Whether income derived from the sale of six leases made by that company should have been computed under the provision of section 337 of the Revenue Act of 1918 (40 Stat. 1096). This claim was not presented in the Elmhurst petition for appeal, but was first urged on the hearing under rule 50. We agree with the ruling of the board that this issue could not be presented for the first time at the hearing provided for under rule 50. Metropolitan Business College v. Blair (C. C. A.) 24 F.(2d) 176.

The causes are reversed and remanded for further proceedings in accordance with this opinion.