## WOOD et al. v. PERKINS.

### (Circuit Court, D. Massachusetts. December 21, 1894.)

### No. 353.

TRUSTS—LACHES.

Plaintiffs, in 1872, conveyed to defendant certain lands, to be put by him into a pool, in exchange for shares of stock of the pool, under the terms of a contract or declaration of trust partly written and partly oral. In 1893 plaintiffs filed their bill, alleging that defendant had put such lands into the pool, but had never paid over the money received by him for the same to the plaintiffs, and held such money as trustee for them, and had fraudulently concealed the fact of his receipt thereof. The evidence was conflicting as to whether certain payments in cash had been made to the plaintiffs, and whether certain orders upon a third party had been accepted by them as cash; but it appeared that one of the plaintiffs, who were joint owners, seasonably knew all that was essential to plaintiffs' rights, whatever they were, and that such orders, if delivered, had been retained so long as materially to diminish their value to defendant. *Held* that, under these circumstances, plaintiffs' delay in bringing suit amounted to laches, and their bill should be dismissed.

This was a suit by Alvinus B. Wood and others against Thomas H. Perkins to establish a trust. A demurrer to the bill was overruled. 57 Fed. 258. Defendant answered and the cause was heard on bill, answer, and proofs.

Henry S. Dewey, for complainants.

Francis Peabody, Jr., for defendant.

PUTNAM, Circuit Judge. By the opinion passed down August 22, 1893, this court, on demurrer, determined the point of laches against the defendant; but now, on opening the record on bill, answer, and proofs, the same point has an essentially new aspect. The allegations of the bill make a case against the defendant as trustee of certain lands of the plaintiffs, to be put by him into a pool in exchange for four shares, of the par value of $3,000 each, of the stock of the pool, which became known as the Perkins Silver Land Pool, and $1,500 in cash. The bill rests for this on a written contract, accompanied with a verbal agreement, necessary to the case and supplementing the written matter. The transaction occurred in 1872, and the bill was filed in 1893. That opinion said, concerning the defense by laches, as follows:

"On the face of the bill, there is a complete answer to this defense, even if it could bring to its support the express language of the statutes of limitation, because the act charged against the respondent was a clear breach of trust, a fraud in equity, and, as the correspondence shows, was industriously, and therefore fraudulently, concealed. With reference to the defense of laches, which is the proper form of defense with regard to a claim of this character, the concealment of the respondent's breach of trust, already referred to, is an ample answer. Another answer is found in the fact that in his letter of March 9, 1889, set out in the bill, he fully recognized the trust by stating therein that he had no objection to reconveying, and taking up the receipt which he gave, although he again industriously concealed the fact that he had already obtained a consideration for the interests intrusted to him. In no view of the case can the rule be invoked that interested parties are sometimes put on inquiry touching a breach of trust, or quasi trust, even though they have no actual knowledge of the facts, because the lack of in-

quiry in this case has not resulted to the detriment of the respondent. There has been no changed condition of circumstances, such as form a frequent basis for the application of the rule of laches, as, for example, in Johnston v. Mining Co., 148 U. S. 360, 13 Sup. Ct. 585, as the entire controversy relates to money received into the possession of the respondent, and there ever afterwards retained."

The allegations in the bill setting out the plaintiffs' case—that is, the stating parts—would have left it demurrable for laches. Thereupon the plaintiffs inserted the charges found in the seventh paragraph, stating, among other things, that the plaintiffs "had no personal knowledge as to the formation of the contemplated pool," which the opinion of August 22d necessarily assumed to be true, and which saved the bill at the hearing on demurrer. These charges were specifically denied in the answer. The denial was relied on at the hearing on bill, answer, and proofs; and in the opinion of the court the charges referred to were not proven, and we are again compelled to meet the defense of laches. For convenience, we will use the word "plaintiffs" in describing the original transactions, although plaintiff Palmer came in subsequently by assignment to him.

In the light of the events supplied by the proofs in the present record, the correpondence referred to, especially the defendant's letter of March 9, 1889, does not bear out the expressions cited from the former opinion; and the case as now made shows that, while the defendant may have departed from the precise terms of the trust in a particular referred to hereafter, he was not guilty of concealment or fraud. It appears, as alleged in the bill, that other persons than the plaintiffs, operating also through the defendant, put other lands into the same pool, to be paid for in cash, or other shares of the same stock; that plaintiff Wood represented these other lands; that all the lands, including the plaintiffs', were computed at 5,228½ acres; that subscriptions were made for 20 shares, amounting to $60,000, for some of which subscriptions the defendant received payment in cash; that the defendant claims he had the option to pay in cash for the lands put in by the plaintiffs; and that in 1872 plaintiff Wood gave the defendant the receipt, of which the following is a copy:

"Boston, April 23rd, '72.

"Received of Thomas H. Perkins, trustee, forty-three thousand five hundred dollars, being in full payment account purchase of 5,228½ acres land on north shore, Lake Superior, being property of the Perkins Land Association. Corresponding with the deeds. A. B. Wood."

Plaintiff Wood testifies that in exchange for this receipt the defendant paid him only $28,500 in cash, of which only $4,500 was for the plaintiffs' land, including the $1,500 referred to, and the balance of $24,000 was for the other lands which he (Wood) represented, and that the deficiency of $15,000 has never been paid to him, in any form. This directly contradicts the bill in a serious particular, because the bill alleges positively that no payment whatever had been made on account of the four shares, and that none of them had been procured for the plaintiffs, or turned over to them. It is

true the bill was signed in behalf of Wood by his solicitor, but it was signed and sworn to by Carlisle. As no explanation of the discrepancy is given, it is to be presumed that Carlisle had not been advised by Wood of the facts in this particular, although he afterwards stated them in his deposition in a perfunctory manner; also, plaintiff Palmer testifies that he did not know them before the bill was filed. Defendant testifies that the balance of $15,000 was paid by him to Wood in five receipts of $3,000 each, in the name of William H. Stevens. Mr. Stevens was a subscriber for five shares in the Perkins Silver Land Pool, and, according to defendant's balance sheet with the pool, had not paid him for them, and there is no evidence otherwise. The receipts for such subscriptions were in the following form:

"Boston, Apr. 22d, 1872.

"Received of —— three thousand dollars $\frac{00}{100}$ part of purchase 5,228½ acres land No, shore, Lake Superior. T. H. Perkins, Trustee.

"$3,000.00."

The effect of the defendant's testimony is that for this balance he delivered Wood receipts in that form, covering five shares, operating in substance as an order on Stevens in favor of Wood for $15,000, and that Wood accepted these as cash. The defendant, in his sworn answer, admits that he received payment for plaintiffs' lands, and asserts that he paid for the same to Wood. Both the admission and the assertion are strictly responsive to the allegations of the bill. Against this, Wood testifies that the cash received by him in excess of $4,500 was in payment for the other lands referred to, but this stands wholly on his unsupported evidence. Wood now admits that he received in cash for himself and for his coplaintiffs $4,500, of which only $1,500 was reported to his associates; so that, although it is not necessary to charge him with intended fraud, yet this dereliction or omission was serious enough to prevent our accepting his unsupported testimony as sufficient, either on the question of the delivery to him of the Stevens receipts, or on that of the application of payments. It is apparent that the defendant also has fallen into errors of statement in his attempts to explain these transactions. The plaintiffs set up a joint interest, and indeed Wood testifies that the lands were owned jointly. But more than 20 years before the bill was filed he knew all the facts necessary to enable the plaintiffs to assert their rights, and also, in behalf of all of them, made, as already explained, a settlement with the defendant, in whole or in part, the details and effect of which the bill states with an essential error, and, in connection with the settlement, Wood gave him what is, on its face, a full and formal written acquittance. If the receipts to Stevens were in fact turned over, in any part, on plaintiffs' account, Wood should have promptly returned them, if not cashed by Stevens; and the retention of them by Wood, if delivered to him, must have materially diminished their value to defendant many years ago. Thus we have long lapse of time, loss of an accurate knowledge of material facts, serious difficulties in the way of weighing the proof accurately, and, for aught that can be plainly seen to the contrary, a changed condition,

seriously detrimental to defendant, if the bill is sustained. In all respects the case is a just one for the application of the equitable doctrine of laches. As, however, defendant's letters undoubtedly caused plaintiff Palmer to misconstrue his rights, and thus induced the filing of this bill, defendant is not equitably entitled to costs, even though his errors were unintentional, as will be further explained hereafter.

Some additional observations are necessary to make it apparent that we have considered the case in all its phases: The allegation in the answer that defendant was given the option to pay plaintiffs in cash is directly responsive to the bill, and is not necessarily contradicted by the written contract between the parties, because the bill itself alleges that this did not constitute the entire arrangement; and it is in harmony with the payment, which Wood now admits was made by defendant, of $3,000 for one share. It is also in harmony with the terms of the receipt of April 23, 1872. The explanation which Wood attempts to give for executing a receipt in full, in advance of settlement, is not sufficiently detailed or supported by explanation to weigh against the effect of the receipt itself, and the testimony of the defendant. Some of the letters written by the defendant to Palmer and Carlisle are not on their face consistent with a claim that he had purchased all the plaintiffs' shares. He alleges in his answer that he received $3,000 for each of the plaintiffs' shares, and paid the same to them; yet he afterwards corresponds with at least two of them as though they were still interested. This is perhaps explained by the letter of April 3, 1874, which will be alluded to in another connection.

We are strenuously pressed with the fact that the defendant's answer states that he received $3,000 for each of the plaintiffs' shares, and paid the same to them, and that Wood testifies that only $4,500 of the cash paid him was on acount of their lands. We have already referred to the fact that plaintiffs' claim as to the application of payments depends wholly on Wood's evidence. We may also add that the answer does not state that these transactions were in actual cash, and that it is not necessarily inconsistent with the hypothesis that both defendant and Wood treated the receipts as cash, as such papers are capable of being used, and are in fact frequently used, in a qualified way. But we do not find ourselves required to solve these inconsistencies, or other such difficulties. They impress us with an increased sense of the practical wisdom involved in the equitable rules touching laches. It is true that according to the ordinary rule, if the plaintiffs inquired of the defendant, or had a right to rely on him, and were misled in consequence, they would not necessarily be guilty of laches. Loring v. Palmer, 118 U. S. 321, 345, 6 Sup. Ct. 1073. It is also true that errors of statements in some of the defendant's letters might well have led some of the plaintiffs, especially Palmer, into misunderstandings; and if all the plaintiffs had been in ignorance of the facts the defendant might not be relieved, even though he also honestly misunderstood. But Wood seasonably knew all that was essential to plaintiffs' rights, as has been already said. Not only

was there the receipt of April 23, 1872, but May 5, 1872, in reply to Wood's letter of May 3d, defendant wrote him a detailed description of the declaration of trust under which the pool lands were held, which, it is apparent from the correspondence, Wood then understood had been completed. This letter Wood acknowledged May 13, 1872; so that at that date Wood knew that the defendant's obligation to deliver the stock under the agreement with the plaintiffs, set up in the bill, had matured, and that the plaintiffs had then a legal right to enforce that obligation, unless Wood had discharged it, in whole or in part, by the transactions and receipt of April 23d. Moreover, the defendant's letter to plaintiff Carlisle, of April 13, 1874, put into the case by plaintiffs, leads to the belief that Carlisle also understood the situation. This letter, after referring to Mr. Stevens, and the shares he had agreed to take, says:

"My understanding was that the shares which were taken were to be accounted to the parties he represented as so much cash, but I judge from the inquiries made by those parties of me that his idea was not precisely the same."

This confirms the defendant's testimony that he made up the balance of $15,000 in receipts running to Stevens, and also that he understood that it was to be determined between the parties directly in interest whether Stevens would settle for the receipts with the persons to whom they belonged, whoever they might be, in cash or in stock. It also explains why in some of his letters, especially that of March 9, 1889, he might be led to assume that some at least of the plaintiffs were shareholders, or rather holders of receipts entitling them to stock, of the form we have described. However, the state of facts is clear as to Wood. As we have already said, the other plaintiffs had a joint interest with him; they have seen fit to make him a party plaintiff in the bill, and their rights under it can rise no higher than his. Nothing in our conclusions is intended to prejudice any right, if any there is, which the plaintiffs may have in the lands themselves, either separately or with others, or to an accounting as legal or equitable shareholders, if such they are. Bill dismissed, without cost to either party.