HAWAIIAN TRUST COMPANY, LIMITED, EXECUTOR OF THE WILL OF JOSEPH THOMPSON BOYD, DECEASED, AND HAWAIIAN TRUST COMPANY, LIMITED, TRUSTEE UNDER THE WILL OF JOSEPH THOMPSON BOYD, DECEASED *v.* RUPERT SIDNEY CROPLEY, JOHN GORDON BANNERMAN, LEWIS PACKER, RICHARD SELKIRKSHIRE BALES, RAY PERCY GODFREY, MILDRED COPLAND, ANNIE AGNES ISABEL GEGGIE, MURIEL MARGUERITE BATTERHAM, NEA JOSEPHINE RODWAY, GEORGE L. HOBSON, REGINALD CLIVE HOBSON, BERYL DOROTHY LILJA, EUNA GLADYS MALONE, AND RHODA V. LEWIS, ACTING ATTORNEY GENERAL OF THE TERRITORY OF HAWAII.

NO. 2818.

ARGUED DECEMBER 5, 1952.　　　　DECIDED MARCH 13, 1953.

TOWSE, C. J., LE BARON AND STAINBACK, JJ.

OPINION OF THE COURT BY LE BARON, J.

This is a bill for instructions by the Hawaiian Trust Company, Limited, as executor of and trustee under the will of Joseph Thompson Boyd, deceased. The trust company as petitioner alleges that it is in doubt concerning its duties with respect to certain of the testator's legacies which left the residue of income of his residuary estate, after providing for certain annuities, to "the TRUSTEES OF THE EDITH BOYD MEMORIAL TRUST FUND in care of the N. S. W. Masonic Schools Welfare Fund, Sydney, N. S. W., Australia," and left the residue of his estate, after the death of certain annuitants, to "said trustees of the EDITH BOYD MEMORIAL TRUST FUND or to said HAWAIIAN TRUST COMPANY, LIMITED, as Trustee under a trust agreement between said Trustees of the Edith Boyd Memorial Trust Fund and said Hawaiian Trust Company, Limited, if such latter trust agreement shall be executed." It should be noted at this juncture that a trust agreement between those parties does not exist in this case.

The first five respondents named in the bill claim to be entitled to the particular legacies in question as the trustees of the Edith Boyd Memorial Trust Fund which, they allege in their answer, was created by the testator during his lifetime through correspondence and "was and is in existence to take the legacies" under his will. The petitioner is in doubt that the trust exists or was so created and, if not, it is in further doubt that the testator manifested a general charitable intent capable of invoking the doctrine of *cy pres*. Accordingly, the bill prays "that an

adjudication be made * * * as to [1] whether Joseph Thompson Boyd [the testator], in his lifetime, created a trust or trust estate known or to be known as the Edith Boyd Memorial Trust Fund and if not [2] whether the attempted gifts [legacies] thereto should be paid by direction of the Court under its cy pres power, and if so, directing such payment." The chancellor by written decision answered the first question in the affirmative so that the second did not arise. By decree he directed that the legacies be paid to the five respondents, who are the executive committee and trustees of the New South Wales Masonic Welfare Fund, as trustees of the Edith Boyd Memorial Trust Fund. Three of the other respondents, as heirs of the proposed settlor, appeal from the decree. As a matter of convenience the Edith Boyd Memorial Trust Fund will hereinafter be called the "memorial fund," the New South Wales Masonic Welfare Fund will be called the "welfare fund," the five respondents claiming to be trustees of the memorial fund will be called the "executive committee" and the three respondents appealing will be called the "heirs."

The heirs specify fourteen alleged errors on which they rely. Broadly speaking, these errors are in challenge of various findings of the chancellor in so far as they are contrary to the thesis of the heirs that the legacies failed, not only for want of a legatee but for lack of a general charitable intent, and therefore passed by intestacy to the heirs. Succinctly stated, the position of the heirs is that the testator, although clearly manifesting an intent to create a trust as a memorial for his late wife to be known as the Memorial Fund as designated in his will, did not intend to create a present trust and did not create a valid charitable trust but rather intended to create a future trust upon subsequent execution of a formal trust in-

strument and died without executing that instrument and without manifesting a general charitable intent in his will. For the purposes of this opinion, however, the question of general charitable intent need not be considered. But two questions merit consideration on appeal. They are (1) whether the testator manifested an intent to create a present trust and, if he did, (2) whether it is a valid charitable trust. The answers thereto depend primarily upon an interpretation of a series of letters exchanged between the testator in Honolulu and the honorary secretary of the welfare fund's executive committee in Sydney. This correspondence is not confined to any one subject but rambles and relates to many personal and extraneous matters. No useful purpose, therefore, would be served by setting it forth in full. But it is necessary to quote apposite portions, even though to do that is at the risk of tediousness.

The following pertinent facts may be gleaned from the testator's letters as a background against which he moved and acted. He was an ardent member of the Fraternal Order of Free Masons and had a strong attachment for his native land, Sydney, Australia, from whence he had come to Honolulu as a youth. In Honolulu he made his fortune in a lifetime of effort. In 1941 he and his wife embarked from Honolulu to visit Sydney. En route she died. After arriving in Sydney he became interested in charitable and masonic work of the welfare fund as an object to which to give some of his wealth in memory of his late wife. He visited its office and was pleased with those he met there. His interest therein was further stimulated through its literature, including the periodical "The Masonian." On return to Honolulu he corresponded with its secretary, A. D. Johnston, whom he addressed as "The Hon. Secretary, Masonic Schools Welfare Fund," Sydney, Australia.

In all his letters he greeted the secretary as "Dear Bro. Johnston" and was in return greeted as "Dear Bro. Boyd." Each signed his letters under the closing phrase of "Yours fraternally" or similar fraternal regards.

The testator's first letter is dated August 24, 1941. In it he enclosed a money order for $50 "as a donation to the Masonic Schools Welfare Fund," with the postscript "In memory of Edith." By letter dated November 18, 1941, he forwarded another money order for the same amount "as part of my Xmas Budget."

Shortly after the letter of November 18, 1941, arrived in Australia, the Japanese Navy attacked Pearl Harbor and war broke out in the Pacific. As a consequence normal trade routes between Hawaii and Australia were cut. Mail service became badly disrupted and delayed. Civilian travel ceased. Such were the circumstances under which the testator in Honolulu and the honorary secretary in Sydney thereafter exchanged letters until their correspondence was terminated by the testator's death on November 27, 1944.

By letter of January 28, 1942, the secretary conveyed to the testator "the very sincere thanks of the President and members of the Executive Committee for this further very practical expression of sympathy with the work we are doing for the children of deceased Masons." As further practical expression thereof, the testator in 1942 forwarded by separate letters two money orders, each for $100, to be applied "to the best advantage in your judgment * * * [and] to give the school money requirements a fair start."

After making these various contributions for the welfare fund itself, the testator broached the subject of further providing for its work but at the same time perpetuating the memory of his late wife through a separate

trust fund which in effect underscored and explained the previous postscript "In memory of Edith." By this change of emphasis in the naming of the object of his bounty in order to memorialize the name of his late wife, the testator commenced the series of letters which constitute the primary source from which to ascertain his trust intent in contradistinction to his prior gift intent.

The initial letter of that series is dated October 31, 1942, from the testator in Honolulu to the secretary in Sydney. In it the testator wrote that he was not allowed to come to Sydney because of "the international situation" and said: "For several reasons this was disappointing— one subject I wanted to make some determination upon, in conference with you and your associates, was the ultimate disposition of certain funds for the benefit of those who need and deserve, and the directions in which they might be best placed. There are so many worthy activities that need help, but the only effective allocation of a definite amount is by over-the-table discussion that I hoped to have personally in a near future." He then suggested the charity of establishing a class for teaching the Braille system of reading to blinded war veterans and added "there must be children of members in this same unhappy condition." He closed by saying "I shall await your word upon this idea—or any other that may seem urgent at present, and send along draft on B. N. S. W. for $5000.00 to get started on something material, or to be invested at the present time to await a later development with the addition of further funds. * * * And, to clarify the object I have in view I wish, ultimately, to establish something that, though modest in amount, would be a memorial to one who was the kindest of women, the inclination lying mostly towards the Schools at Baulkham Hills. So, you can let me have your thought upon this and

a later development can come when and as possible."

By letter dated January 5, 1943, the secretary replied and wrote under the caption "MEMORIAL FUND" that "I thank you for considering the ex-pupils of the Masonic School in your desire to establish a Fund to commemorate the life of your good wife. I think your ideas very good and a very practical way of remembering a dear one. A meeting of the Management Committee is to be held on Monday next, and your suggestions will be considered by that committee * * *."

In further acknowledgement of the testator's letter of October 31, 1942, the secretary wrote on January 27, 1943, that "As personal contact is not possible, may I explain that every member of the Executive Committee is an honorary worker in the strict sense of the term. Not one penny is paid to any member or office bearer by way of honorarium or in the form of expenses. I stress this point as evidence of the fact that the suggestions which follow are made with the one purpose in view, viz., doing all within our power for the children of our deceased brethren and it is indeed comforting to know that one as far away is prepared to join with us in this wonderful work." He then set forth those suggestions "after very careful consideration of the suggestions contained in your letter." He continues by stating that "the Executive Committee has asked me to submit the following for your consideration:

"1. The establishment of a Memorial Trust to be designated in accordance with your desires. The interest from the amount invested to be distributed as suggestion in paragraph 3.

"2. The Trust to be under the control of Trustees elected from members of the Executive Committee of the N. S. W. Masonic School Welfare Fund.

"3. Assistance to be granted to ex-pupils (boys and girls) of any Masonic School under the jurisdiction of the United Grand Lodge of New South Wales, hereinafter referred to as Masonians, who have been members of any of the War Services and/or the Mercantile Marine.

"4. If by effluxion of time there should be no ex-Service personnel needing assistance the Trustees to be empowered to grant assistance to other Masonians.

"5. Recipient of assistance to be advised of the source from which the assistance is given."

The secretary then concludes with the following three sentences. "In submitting the foregoing for your consideration the Executive Committee feels that the greater need of the future for some time to come will be in respect of those young people who have sacrificed so much in an effort to serve their King and Country. In making these suggestions we have not for one moment overlooked your suggestion regarding the establishment of a Braille Library, but in this connection would like to point out that in Sydney we have an excellent institution of that kind which has been established for quite a number of years. My Committee has endeavoured to formulate a scheme in accordance with your wishes and will be glad to consider any alterations or further suggestions you might care to make, their one desire being to assist you to bring to fruition the very practical form of memorial you have in mind."

In response to that letter, the testator on April 19, 1943, wrote in full as follows: "Your letter of Jan. 27th. outlines a very practical plan for the use of funds that I am desirous of providing the School Welfare, and I am in hearty accord with your suggestions in full. Paragraph 3

is particularly applicable at this time, and, for the further-
ance of this object, I shall forward you draft on B. N. S.
W. for $5000.00, at end of June (accrued interest, in
Savings Banks here, is payable half yearly on entire six
months). As there will be some elapsed time before the
investment earning power of this sum becomes available,
I would put into practical effect the last line of the verse
in Mr. Cropleys letter (Masonian, March 1st) 'For to see
good put in action is what everybody needs,' by the en-
closure of $200.00 to help in such immediate needs as may
be urgent. The tentative suggestion in Paragraph 4 can
be more particularly discussed in that happy time [when]
people may travel the world again in safety. The main
amount I would wish to be considered as the nucleus of a
Memorial to my wife, Edith, which I hope and expect to
increase at a later time, when we shall be able to get our
bearings in this topsy turvy world, with all its present
uncertainties. To you, and the other Committee members
who will be handling this matter I give hearty thanks—it
is their just due as exemplary of applied masonry in its
practical form."

In acknowledgment of that letter, the secretary wrote
on May 18, 1943, the following: "I placed your letter be-
fore my Committee on the 10th instant, the members of
which have asked me to assure you that your so ready
acquiescence in the majority of the proposals submitted
by them for your consideration is very gratifying. They
readily agree with your suggestion that consideration of
Clause 4 of the suggestions await the happy time which
cannot come too soon, when peace and goodwill has been
restored and thus provide you with the opportunity to
again visit sunny New South Wales and discuss the matter
in person. In the meantime the Committee has decided on
the establishment of what will be known as The Edith

Boyd Memorial Trust Fund and trust that this designation will meet with your approval. A Deed of Trust will of course be necessary, the preparation of which the Committee is quite prepared to leave to you if you so desire, or if it would meet with your wishes the document could be prepared by our Honorary Solicitor. Your wishes in this regard in due course will be greatly appreciated."

To that letter the testator on July 17, 1943, wrote that "Naming this fund as suggested 'The Edith Boyd Memorial Trust Fund' is thoroughly in line with my wishes, and I would like it understood that the present remittance [*i. e.*, $5000] is to form the nucleus of what I intend to add to later—substantially, I hope, if this miserable war leaves us with more than the shirts on our backs. But, much or little, as it may develop, with its application will go the goodwill of her, who ever had the kindly thought and helpful hand for those who needed and deserved."

On August 5, 1943, the secretary responded and advised the testator of advance application to invest the $5000, as the nucleus of the memorial fund, in treasury bonds of the next Australian War Loan at interest of 3-1/4%.

By letter of September 1, 1943, the secretary announced that "the Committee decided to appoint" certain officers of the Welfare Fund as "provisional trustees" of the memorial fund but did not request the testator's approval. The testator never acknowledged receipt of that letter. Nor did the secretary ever again refer to the committee's unilateral decision to appoint provisional trustees. Thus the testator gave no indication that he had received this particular letter or approved of the committee's decision and the secretary apparently did not deem it of sufficient importance to press for a reply. It, therefore, cannot be reasonably considered as being re-

flective of the testator's trust intent, particularly so when the entire correspondence is considered as a whole.

By letter dated October 6, 1943, the testator answered the secretary's letter of August 5, 1943, relative to the proposed investment in treasury bonds. He wrote that "I am very much pleased at the method of handling my little effort toward the establishment of the Edith Boyd Memorial Trust Fund and would state that I am fully satisfied and appreciative of the account of outlay submitted."

On October 27, 1943, the secretary acknowledged receipt to the "Bank of N. S. W." the "further $5000 on account of the Edith Boyd Memorial Trust Fund * * *."

By letters of January 17 and 18, 1944, the testator advised the secretary that he was forwarding a draft for $15,000 "of which I wish you to apportion $5000.00 to the Trust Fund" and enclosed "the formal request to yourself, as Hon. Sec. to Welfare Fund, to apply the amount, $5000, to Trust Fund." This concluded his *inter vivos* transmittals of capital, totaling $15,200, for application to the "Trust Fund" or memorial fund.

In a letter dated May 17, 1944, the secretary "at long last" forwarded "a draft copy of the proposed Declaration of Trust establishing the Edith Boyd Memorial Trust Fund." The secretary made running comments on each clause of the draft copy and characterized its third clause as "debatable" because it permitted expenditure of corpus when the income might be insufficient to meet the objects and purposes of the trust. It is not necessary to burden this opinion with the body of that draft. Suffice it to say that such draft proposes a valid charitable trust of an educational character and sets forth the essential terms and purposes of one in which the members of the executive committee of the kindred welfare fund are the trustees.

That letter and enclosure were acknowledged by the testator in a letter dated August 20, 1944. He wrote that "The various sections of Trust Fund provisions seem fully satisfactory to me and well considered in view of present conditions and needs, and a certain amount of elasticity is always allowable, and sometimes necessary to cover the intent of such—this elasticity could well be applicable to the debatable features of Clause 3, to the extent that a necessary diminution of 'corpus' in one period of stress could be refunded later under easier conditions, as it was my thought that the Fund would have a certain amount of permanency which might be impaired by this without control." He thus approved the terms and purposes of the trust, inclusive of their elasticity as applied "to the debatable features of Clause 3," consistently with the permanent nature of a charitable trust. He then continued with the following informative statements. "Of course, as it now stands the Fund is a very small proposition, but it is my intention that it will receive additions from time to time and, ultimately, be well into six figures (dollars), when its income will be more worth while handling than it is at present. With this one point reserved till we meet personally for a more definite discussion of amounts available, when and as, I would say that I am fully satisfied with the draft as set forth. With everything so unsettled at present it would be futile to attempt anything in the way of definite detail, the main point I had in view was make the start to do what little good is possible at present, and would repeat my gratitude to you and your associates for the interest you are taking."

By letter dated September 21, 1944, the secretary replied. The pertinent paragraph thereof is as follows: "I have now placed your letter before the members of the Executive Committee and they are very pleased to know

that, generally, the draft Deed of Trust meets with your approval. Clause 3 which gives the Trustees power to use a portion of the corpus was very keenly debated, and was partly the cause of the delay in completing the draft. The members of the Committee were trying to draft the Deed to fit in entirely with your wishes, but they had no idea of what amount you proposed to invest in that Fund. Now, as you state in your letter under reply, you propose eventually to build it up to something like six figures in dollars it throws a different aspect on the matter altogether. As there is not likely to be a claim on this fund before you arrive in this country, it will be best to let the matter stand over until the whole thing can be settled by a personal chat with your Goodself."

The letter of September 21, 1944, from the secretary in Australia was presumably received by the testator in Honolulu some time in the first part of October 1944, and, if received, concluded the series of letters. On November 19, 1944, the testator was stricken ill. On November 20, 1944, he caused the petitioner to bring to him his will, which had been drawn some five months earlier, and executed that will without altering it. One week later, on November 27, he died leaving an estate valued at $140,000.

To ascrtain the intent of the testator with respect to the trust or memorial fund, the series of letters between him and the secretary of the welfare fund must be taken together and construed as an integral whole. In other words, they are all to be "read together as one instrument for the purpose of establishing the trust." (*Loring* v. *Palmer*, 118 U. S. 321, 339, 340.) The primary objective is to determine whether the testator manifested an intention to create that trust on his delivery of drafts and money orders, totaling $15,200, through the mails to the secretary of the welfare fund for application to the memo-

rial fund, and whether he took sufficient steps to put such trust into effect before he died. The correspondence between them is therefore to be read in the light of all the facts and circumstances attending the transaction which would be presumed to be in the mind of the testator in doing what he did toward accomplishing his purpose. When so read, the conclusion is inescapable that the testator not only manifested an intention to create a trust to be called "The Edith Boyd Memorial Trust Fund," which the heirs concede, but did create that trust by the same manifestation, which they deny.

In support of that denial relative to an intent to create a present trust, the heirs argue that the testator intended only to create a trust to be declared in the future by a deed of trust. They point to the fact that both the testator and the secretary, on behalf of the executive committee, contemplated the subsequent execution of a formal trust instrument. That fact, standing alone, ordinarily would be a strong indication that the testator did not intend to create and the committee did not intend to accept a trust until execution and delivery of the instrument in the future. But that is not the case here, where there are circumstances of far stronger probative effect to the contrary. Nor does "the mere fact that the settlor contemplates the subsequent execution of a formal instrument * * * necessarily negative the present creation of a trust, if its terms are sufficiently indicated." (Scott on *Trusts,* vol. I, § 26, pp. 162, 164.) On the contrary, that fact in such a case may be entirely consistent with the present creation of the trust, as it is in this case.

As already indicated, the testator and the executive committee were in agreement upon the terms and purposes of the trust, the only uncertainty being the extent of ultimate transfer to it. Admittedly, the testator manifested

an intention to create a trust. With equal force he manifested an intention to create a present trust. This is indicated by his words at the outset when he wrote that "I would put into practical effect the * * * line of verse * * * 'For to see good put in action is what everybody needs' by the enclosure of $200 to help in such immediate needs as may be urgent." It is further indicated at the close when he declared that "the main point I had in view was make the start to do what little good is possible at present" even though "as it now stands the Fund is a very small proposition" [*i. e.,* its capital being $15,200], which "it is my intention * * * will receive additions [from me] * * * and, ultimately, be well into six figures (dollars), when its income will be more worth while handling than it is at present." It is also indicated by his direct and positive acts throughout the transaction, such as his transfer of money to the proposed trustees for application to the trust fund, his approval of their investment of that money under agreed terms and purposes of trust and his ultimate designation of the trust by name in his will as the residuary legatee to which he wanted the bulk of his estate to go upon his death. These acts constitute a recognition by the testator of a present and existing trust as well as an executed and functioning one. Consistent with that recognition, he had planned to go to Sydney to meet the trustees "personally for a more definite discussion of the amounts available," which amounts would be in addition to those already transferred by mail and which he envisioned would be transferred by deed. But when it became apparent that war and his own illness were effectively thwarting those plans as to place and means of transfer, he executed his will in Honolulu on what proved to be his deathbed. By that will, he in effect arranged that the trust corpus would "receive additions and, ultimately,

be well into six figures (dollars)." From all these facts and circumstances, it is apparent that the testator contemplated a subsequent trip to Sydney as the place for executing a deed of trust, not to give completion to an inchoate trust but to determine the ultimate extent of gifts to be made to a completed trust, and as a matter of convenience to reaffirm that trust so as to consolidate in one document that which had been declared piecemeal in many documents.

This is not a case of instructions to a lawyer to prepare a deed of trust as in *Lloyd* v. *Brooks, et al.,* 34 Md. 27, on which the heirs rely, where it was well understood "that the trust was to be declared by deed." Nor is it a case of a failure to deliver a deed of trust as in *Duer* v. *James,* 42 Md. 492, where the proposed trustees refused to accept the instrument. On the contrary, it is essentially a case of a sufficiently declared trust where the settlor endowed the trust with various sums of money from time to time and planned eventually to settle upon it the major portion of his estate to be transferred by deed, but actually arranged for such a transfer by will when conditions beyond his control intervened to cause him to employ the latter means of transfer rather than the first.

The heirs claim in the alternative that the trust, if presently created, was a private one which failed "as being in violation of the rule against perpetuities." They base that claim on the theory that the trust is not charitable because its purpose of "assistance" as set forth in the secretary's letter of January 27, 1943, does not necessarily connote a charitable purpose. They admit, however, that the same word as set forth in the subsequent draft deed of trust and as approved by the testator does specify "a definite type of assistance which [they] concede meets the requirements of a charity." But that draft and its ap-

proval are parts of the letters which must be read together as one instrument and construed as an integral whole. When that is done it becomes obvious that the word "assistance" as last used relates back and qualifies its first use to connote only a charitable purpose. Buttressing that construction are the necessary implications arising from the surrounding facts and circumstances. The testator was an ardent Mason vitally interested in furthering the educational work of Masons being carried on by means of the welfare fund, a charitable trust itself. Likewise were his fellow Masons with whom he joined in that work and named as his trustees. By mutual understanding, the new memorial fund was nothing more than a separate trust fund of the old welfare fund. The new thus became essentially a part of the old in all but name and purpose of memorial, so that it necessarily assumed the same character as a charitable trust. The presumption is well nigh conclusive that the testator was familiar with the educational purposes of the welfare fund, knew them to be charitable in character and advisedly brought the memorial fund within their scope by the very manner in which he created and set up the trust. This underlying intent, creative of a charitable trust, is manifested throughout the entire transaction. The claim of the heirs to the contrary is untenable.

Decree affirmed.

*E. Z. Buck* (*Lewis, Kimball & Buck* on the briefs) for appellants Geggie, Copland and Malone.

*C. N. Tavares* (*Pratt, Tavares & Cassidy* on the brief) for appellees Cropley, Bannerman, Packer, Bales and Godfrey.